KENNON, Justice.
 

 Battie H. Rea, alleging that he was the owner of the entire capital stock of the Baton Rouge Union Stock Yards, Inc., and that Harry B. Nelson had possession of this stock and was illegally proceeding to-liquidate the affairs of the corporation, filed suit to be declared the owner of the stock and to enjoin Nelson from proceeding further with the liquidation of the corporation.
 

 In his answer, Harry B. Nelson denied that Rea owned the stock. The district judge upheld Nelson's contention and refused to grant a preliminary injunction. Rea’s application for writs to this Court was granted.
 

 In his application for the writs, Rea complained of an exchange of judges in the case, setting forth that the case had been allotted to Judge Herget, Division
 
 “B”
 
 of the 19th Judicial District Court., and after this judge permitted, on the day the matter was fixed for trial, the filing
 
 *1014
 
 by Nelson of “some very extra-ordinary ■defensive pleadings,” Rea’s counsel objected to going to trial on the ground that Nelson had not filed an answer, and that Judge Herget ordered counsel for Nelson to file his answer, granting a twenty minutes recess for that purpose; that during the recess, which lasted in excess of three hours, Judge Herget announced that due to the necessity of his being absent from the Parish, Judge Holcombe, presiding Judge of Division “A” of the same court, would continue to try the rixle; that Judge Holcombe did complete the hearing of the case at 10 o’clock p. m. on that same day and signed the formal judgment three days later, dissolving the temporary restraining order, and denying Rea’s application for a preliminary injunction.
 

 In his brief filed in this Court, Rea’s counsel has not re-urged the complaint as to the change of judges, possibly for the reason — as shown by the judge’s return and minutes — that Judge Herget reserved his ruling on the admissibility of the special pleadings filed by Nelson and the first action of Judge Holcombe, after taking up the case for hearing, was to sustain Rea’s objection to all of Nelson’s defensive pleadings, filed while Judge Herget was presiding and to require Nelson to go to trial “without the benefit of exceptions.”
 

 The record shows that the entire stock of the Baton Rouge Union Stock Yards, Inc., was sold on June 5, 1946, in block; that Rea had handled all of the negotiations with the stockholders and their attorneys. Nelson testified that Rea was acting throughout as his agent. On the day of the sale, Nelson’s secretary (Nelson being out of town) declined to deliver Nelson’s check for $30,000 (the total price of the stock block) to Rea, except in exchange for the stock certificates. Her testimony gives a detailed account of the purchase:
 

 “Q. Will yoxx relate to the Court what took place on June 5, concerning the drawing of that check, what conversation you had with Mr. Rea and what he said? A. Mr. Rea called me up about 9 :30 and said, ‘AH of the stock is signed’. Mr. Harry was out of town. That was June 5. I knew he would not be back 'for another ten days at least. I asked him couldn’t it wait. He said that Jack Laycock was going out of town and would not be back until Saturday. He said, T will be right on down.’ He got down there in twenty minutes. When he came in he said — we talked about the deal and I asked him if all the stock certificates were signed. He said, yes, that they were all in Jack Lay-cock’s office. I told him I would like to put in a call to Mr. Harry and check with him, although he had. told me to pay him the $30,000 and get the stock. He said, T am supposed to get half of it.’ He said, ‘Mr. Harry agreed to lend me half,’ and he was — I said, ‘I don’t know anything about that. All I know, Mr. Harry told me to pay $30,000 and get the stock.’ I said, ‘Let’s go over to the bank.’ We
 
 *1016
 
 went to the bank. I talked to Mr. Ward, Senior, and told him Mr. Harry was out of town and that I had the $30,000, but wanted
 
 to get
 
 all the stock certificates. In the meantime, I had told Mr. Rea I would go up there with him and get them. Mr. Rea said, ‘Oh, no. Nobody can know that Mr.' Nelson is in the deal. You can’t go.’ I didn’t want to queer the deal at the last minute, so I went and talked to Mr. Ward, Senior, about how I could get hold of the stock without appearing in the deal. He said, T will send Miss Ford to get them and bring them back and nobody will know who they are for’. So I dictated the letter — he asked me to do that — to one of the stenographers in the bank, and asked Mr. Rea to sign it, which he did, and Mr. Ward asked Miss Ford to go up with Mr. Rea to get the certificates, and Mr. Rea and I went— he had the check made out already in the amount of $30,525.”
 

 In plaintiff’s petition, and in his testimony on direct examination, he stated that he secured the money for the purchase of the stock from the Fidelity National Bank of Baton Rouge rather than from Harry B. Nelson. However, on cross-examination, he admitted that the $30,000 used in purchasing the stock came from Nelson through his Secretary. We quote from his testimony:
 

 “Q. Mr. Rea, I want to warn you that 1 intend to impeach your testimony. You have just made the emphatic statement after wárning—
 

 “Mr. Kennedy: You have not warned him.
 

 “Q. I am warning him now. You state now that the way that transaction was-handled the bank put the $30,000 to your credit and that you owe the bank and that the stock was pledged — A. The statement shows itself.
 

 “Q. I show you a check dated June 5,. payable to the order of B. H. Rea in the amount of $30,000, signed by Harry B_ Nelson, per Mildred Dubois, and I ask you if -you recognize that check. Do you recognize that check. Do you recognize-that check? A. No, sir:
 

 “Q. You don’t recognize that check? A. Never did see it
 

 “Q. I want to warn you that I intend to impeach your testimony. You say you don’t even recognize that check? A. I never did see it She put it to my credit.
 

 “Q. Whose signature appears on the back of that check? Is that ‘B. H. Rea Truck Lines, by B. H. Rea’?
 

 “By the Court:
 

 “Q. Is that your signature on the back of the check? A. Yes, sir.
 

 “Q. Does that check represent the-$30,000 that the bank gave you credit for?' A. I guess it does. I don’t remember seeing this. I won’t deny my signature.
 

 “Q. Had you forgotten about this when you testified they didn’t give you a check? A. Yes, sir.
 

 
 *1018
 
 “Q: -That they just' gave you credit for $30,000? A. Yes, sir.
 

 “Q. You had forgotten about this check? A. Yes, sir.
 

 “By Mr. Pierson:
 

 “Q. Did you endorse that check? A. I told you a while ago I endorsed it.
 

 “Q. Is that the one that was deposited to your account? A. Yes.”
 

 Plaintiff’s inconsistency is further shown by his testimony on page forty-five of the transcript:
 

 “Q. Did you tell Mr. Kennedy when this petition was prepared that you had signed that check? A. No, sir. ■ I overlooked it.
 

 “Q. You didn’t tell Mr. Kennedy you endorsed that check for $30,000? A. I overlooked it.
 

 “Q. Your lawyer didn’t know you had done it? A. No, sir. I just overlooked it.
 

 “Q. The truth will come out sometime. A. Yes. When the truth bobs up in front of me I will tell it, too.”
 

 Rea’s contention that he purchased the stock as principal and became the owner is also contradicted by W. L.eroy Ward, Jr., Executive Vice-President of the Fidelity National Bank, as well as W. H. Gillen, each of whom testified that Rea, while the negotiations were in progress, said that he was acting for Harry Nelson.
 

 Our study of the entire record convinces us that the district judge’s finding that Rea was not the owner of the stock is amply sustained by the evidence.
 

 The record shows that Rea performed services in connection with Nelson’s acquisition of the stock, and on this matter, the district court held: “ * * * The
 

 question as to what Nelson might owe the plaintiff either by contract. or quantum meruit basis as a commission for confecting this sale and the amount which Nelson may owe to his agent for what he (the agent) may have advanced to complete the sále is not before the court.” Rea’s rights to assert these claims against Nelson are 'not affected by the terms of the district court judgment before us.
 

 In view of our finding that Rea is not the owner of the stock, it becomes unnecessary to consider his complaints regarding the actions of Nelson towards liquidation of the corporation.
 

 The rule nisi and stay order issued by this Court on the 31st day of July, 1946, are recalled; the judgment of the district court is affirmed. Costs of the proceedings in this Court to be .paid by relator.